In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3494 & 09-3495

CHARLES MCEVOY,

*Plaintiff-Appellant*,

and

KKL DEVELOPMENT, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

IEI BARGE SERVICES, INC.,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 06 C 50080 & 07 C 50007—**Frederick J. Kapala**, *Judge.*

ARGUED APRIL 5, 2010—DECIDED SEPTEMBER 7, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* East Dubuque, Illinois, is a small
town on the Mississippi River. One local company that
has profited from the river's proximity is IEI Barge Ser-

vices, Inc. ("IEI"). IEI stores coal in an outdoor pile and loads it onto river barges. As the coal is moved around, coal dust is thrown off into the air. One of IEI's neighbors, Charles McEvoy, objected to the coal dust from IEI's operations, because it was drifting into his home; he filed suit in federal court. McEvoy's concerns were shared by others in the area. KKL Development, LLC ("KKL"), which owns commercial property in East Dubuque, and Vroom Auto Mall and RV Plaza, Inc. ("Vroom"), which runs its business on KKL's property, worried that the dust would accumulate on their inventory and would create a hazard for their employees. The companies filed their own lawsuit, which mirrored McEvoy's.

Law students and professors around the country might find this story familiar; in a famous hypothetical, pollution emanating from a nearby factory sullies recently cleaned laundry drying on a clothesline. See, *e.g.*, ROBERT COOTER & THOMAS ULEN, LAW & ECONOMICS 100-04 (5th ed. 2007); Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 HARV. L. REV. 1089 (1972); Frank I. Michelman, *Pollution as a Tort: A Non-Accidental Perspective on Calabresi's Costs*, 80 YALE L.J. 647 (1971). The facts offer a pedagogically useful vehicle for discussing how different legal rules can be used to internalize external costs. This appeal is not, however, about clean laundry or the proper allocation of costs. Rather, it is about which legal tools are available to someone who wants to shift the cost of pollution to the polluter. We must consider whether the Clean Air Act (the "Act"), 42 U.S.C.

§§ 7401 *et seq.*, supports a private right of action permitting neighbors adversely affected by this coal dust to enforce two Illinois environmental regulations that IEI allegedly violated. The district court concluded that the Act's citizen-suit provision does not support such an action. While we have no trouble recognizing why plaintiffs are seeking a remedy, we too conclude that the plaintiffs' allegations fall outside the scope of the Act.

# I

In the 1950s, Dubuque Sand & Gravel began operations in East Dubuque. In 1988, the company was renamed IEI; it has conducted operations on the Mississippi under that name ever since. IEI works with bulk materials, including coal. The company receives the materials from train cars, and either immediately loads them onto river barges or stores them on its premises in East Dubuque for later loading. According to the plaintiffs, all of IEI's activities release coal dust that is blown by the wind onto adjacent properties.

As we have mentioned, each of the plaintiffs has a stake in nearby property that is affected by the coal dust. McEvoy owns residential property. He alleged that he routinely observes coal dust crossing IEI's property line; he shuts his doors and windows to prevent the dust from accumulating in his home. KKL owns commercial property, which it leases to Vroom for use as a car and RV-camper dealership. The companies alleged that coal dust is regularly deposited on the dealership's in-

ventory. They also worried that constant exposure to the coal dust would adversely affect employee health.

Fed up with this situation, the plaintiffs repaired to federal court. McEvoy filed a complaint in April 2006, and KKL and Vroom followed in January 2007. The complaints alleged theories of recovery under the citizen-suit provision of the Act. See 42 U.S.C. § 7604(a). (They also raised claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, and state-law theories— namely, trespass, negligence, and nuisance.) As described in further detail below, the Act provides for citizen suits to enforce certain limits set by federal and state environmental laws. Invoking this mechanism, the plaintiffs asserted that IEI was violating five Illinois environmental regulations. Two of those regulations are at issue in this appeal. The first is Section 201.141, entitled "Prohibition of Air Pollution," which provides:

> No person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of this Chapter, or so as to prevent the attainment or maintenance of any applicable ambient air quality standard.

ILL. ADMIN. CODE, tit. 35, § 201.141. Second is Section 212.301, the "Fugitive Particulate Matter" regulation, which states:

> No person shall cause or allow the emission of fugitive particulate matter from any process, including any

material handling or storage activity, that is visible by an observer looking generally toward the zenith at a point beyond the property line of the source.

ILL. ADMIN. CODE, tit. 35, § 212.301.

IEI responded with motions for summary judgment in both cases; it asked the court to find that the plaintiffs had failed to state a federal claim and then to dismiss the supplemental state-law claims without prejudice. The district court did just that on September 11, 2009, granting IEI's motions for summary judgment. Of particular relevance to this appeal, the district court concluded that the Act did not provide a private right of action to enforce the two Illinois regulations quoted above. (The district court amended its judgment to comply with the Federal Rules on May 7, 2010, but the substantive decisions remained the same.)

The plaintiffs appeal only from the district court's judgment barring them from using the Act to enforce Illinois's Prohibition of Air Pollution and Fugitive Particular Matter regulations. They do not challenge the district court's disposition of the claims based on the other Illinois regulations, nor have they complained about its decisions on their RCRA and state-law claims. We consolidated these appeals for our review.

## II

The Act brings together federal, state, and private resources for the purpose of protecting and enhancing the quality of the nation's air. 42 U.S.C. § 7401. Central

among the tools that the Act creates to effectuate these objectives are the national ambient air quality standards (the "NAAQS"), see *id.* § 7409. The NAAQS are set by the federal Environmental Protection Agency (the "EPA") and further implemented through State Implementation Plans ("SIPs"), see *id.* § 7410. (We apologize for this mess of alphabet soup, but these abbreviations are in such common use that it would only confuse to adopt anything more felicitous.) SIPs are required if the state wants additional emission limitations; they also establish the regime governing pollution permits. *Id.*

Setting standards is just the first step; without effective enforcement those standards would be so many words on a piece of paper. The Act authorizes the EPA to enforce its provisions and implementing rules. 42 U.S.C. § 7413. In addition, the Act includes a "citizen suits" provision, which provides that private citizens may bring civil actions in federal courts against, among others, violators of emission standards or limitations. *Id.* § 7604(a)(1)(A). Citizen-suit provisions in environmental laws empower individual persons to serve as private attorneys general and to enforce standards set at the federal or state level. The theory is that the efforts of these private parties will supplement governmental enforcement.

## A

As we have already noted, McEvoy and his fellow plaintiffs have alleged that IEI violated Illinois's Prohibition of Air Pollution and Fugitive Particulate Matter

regulations. They identified the Act's citizen-suit provision as the source of their entitlement to seek a remedy for those alleged violations. This appeal asks us to look closely at the types of provisions that a citizen may enforce through the Act. The plaintiffs invoked the Act's express right of action "against any person . . . who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter . . . ." 42 U.S.C. § 7604(a)(1)(A). One learns immediately from this language that the right to sue is tethered to the Act's definition of the phrase "emission standard or limitation under this chapter." See *id*. § 7604(f). Paragraph (f) creates four categories of enforceable standards and limitations. The plaintiffs are relying on subparagraphs (f)(1) and (f)(4), and so we reprint only those parts of the definition here. Emission standards and limitations enforceable through § 7604(a)(1)(A) include:

> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, [or]
>
> . . .
>
> (4) any other standard, limitation, or schedule established under any permit issued pursuant to [42 U.S.C. §§ 7661-7661f] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations[,]
>
> which is in effect under this Act (including a requirement applicable by reason of [42 U.S.C.

§ 7418]) or under an applicable implementation
plan.

42 U.S.C. § 7604(f). To establish a right of action, there-
fore, the plaintiffs must identify a regulation that
qualifies as an "emission standard or limitation" as
defined in subparagraphs (1) and (4). We begin by ex-
amining what these subparagraphs tell us about the
types of emission standards or limitations that are en-
forceable under the Act, and then we consider whether
the particular Illinois regulations on which plaintiffs
rely meet those criteria.

A plaintiff may sue to enforce a regulation if that regula-
tion is "a schedule or timetable of compliance, emission
limitation, standard of performance or emission stan-
dard." 42 U.S.C. § 7604(f)(1). We look to the definitions
section of the Act for the meaning of the key terms, in-
cluding "emission limitation," "emission standard,"
"standard of performance," and "schedule and timetable
of compliance." *Id.* § 7602(k), (l) & (p).

The plaintiffs take the position that because § 7604(f) is
itself a definition, it "trumps" any other definitions pro-
vided in the statute, by which they seem to mean
that when it came to this subsection, Congress for
some mysterious reason wanted its more precise defini-
tions not to apply. Pressing on, the plaintiffs argue that
§ 7604(f)(1) is independent of § 7602. This does not
make sense. There is nothing in the citizen-suit provision
indicating that Congress intended it to be insulated
from the rest of the statute. In fact, Congress said the
opposite in the *chapeau* to the definitions section; that

introductory sentence begins by instructing readers that the definitions apply "[w]hen used in this chapter." *Id.* § 7602. The citizen-suit provision is most certainly part of "this chapter," and there is no language in the statute indicating that the definitions are not applicable across-the-board.

The plaintiffs' citations to First and Fifth Circuit decisions do not rescue their position. They rely on a foot-note from a First Circuit decision, *Conservation Law Foundation v. Federal Highway Administration*, 24 F.3d 1465, 1477 n.5 (1st Cir. 1994) (suggesting the "trumping" theory), but that court has since applied the definitions section to § 7604(f)(1), see *Conservation Law Foundation v. Busey*, 79 F.3d 1250, 1258 (1st Cir. 1996). The Fifth Circuit decision addressed § 7604(f)(4). See *CleanCOALition v. TXU Power*, 536 F.3d 469 (5th Cir. 2008). Subparagraph (f)(4)—unlike (f)(1)—uses terms that are not defined in § 7602, and so there is nothing strange about a conclusion that § 7604(f)(4) to that extent stands on its own legs, while at the same time realizing that terms defined in § 7602 retain those definitions when they appear in § 7604(f)(1).

We therefore proceed on the understanding that plaintiffs are bound to the statutory definitions, wherever the defined terms appear. Their argument on appeal can thus be boiled down to the proposition that the Illinois provisions constitute "emission standards" or "emission limitations" under § 7602(k). They do not assert that IEI has violated any "standards of performance" and "schedules or timetables of compliance" under § 7602(l) and (p).

Accordingly, in order to prevail, they must identify an Illinois regulation that establishes:

> a requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.

42 U.S.C. § 7602(k) (defining "emission limitation" and "emission standard").

In addition to this general definition of "emission standard or limitation under this chapter," there is a catchall provision in the Act that allows citizens to sue to enforce

> any other standard, limitation, or schedule established under any permit issued pursuant to [42 U.S.C. §§ 7661-7661f] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations . . . .

42 U.S.C. § 7604(f)(4). Plaintiffs seek to enforce both of the Illinois regulations under this provision as well.

### B

The question that perplexed the district court was whether a plaintiff is authorized to enforce standards

and limitations found only in an SIP through this provision. The key phrase for this purpose is "under any applicable State implementation plan." The district court concluded that this text lends itself to two reasonable interpretations. Under the first, the statute authorizes citizen enforcement of "any other standard, limitation, or schedule established . . . under any applicable State implementation plan," while under the narrower reading it would allow enforcement only of "any other standard, limitation, or schedule *established under any permit* issued . . . under any applicable State implementation plan." (Emphasis added.) Under the former view, a plaintiff is entitled to enforce all particular standards spelled out in an SIP, while the latter view contemplates private enforcement only of standards, limitations, or schedules reiterated in a permit issued under an SIP. The district court concluded that the language of the statute was ambiguous, but that other tools of statutory interpretation favored the latter option. Since McEvoy and his fellow plaintiffs were not seeking to enforce a permit term, the district court concluded that their case had to be dismissed.

Contrary to the district court, we find that the statute permits citizen enforcement of standards found in an SIP, even if those standards are not repeated in a permit. We begin with the language of the statute. Unlike the district court, we do not find the statute to be ambiguous. It can and should be read in the first way that the district court identified. Looking again at the language, we see that citizens may sue to enforce standards "under any permit . . . or under any applicable

State implementation plan . . . ." 42 U.S.C. § 7604(f)(4). That does not suggest that permits are always necessary; to the contrary, it indicates that the state plans are an alternate legal basis for suit. The district court distinguished between permits issued "pursuant" to the statute and permits issued "under" an SIP. But that disregards the fact that the Act—taking advantage of cooperative federalism—is enforced more generally through state plans. At least in states that have an approved SIP, like Illinois, there are no permits somehow issued directly under the Act. The most natural grammatical reading also has the advantage of avoiding this tension with the overall statutory scheme.

Since the district court found the statute ambiguous, it turned to legislative history, policy, and other decisions for assistance. We see no need to delve into the legislative history, but we will say a word about the court's other concerns.

First, the district court thought that the plaintiffs' reading of subparagraph (f)(4), under which they would be authorized to enforce any standard or limitation found in an SIP, would render the more particularized definition from § 7604(f)(1) redundant and superfluous. If subparagraph (f)(4) applied to standards found in an SIP that are not in a permit, it feared, then plaintiffs would never need to show that a particular regulation in an SIP met the definition in § 7602. To avoid this problem, the district court limited (f)(4) to suits about permits. But the district court's reading of (f)(1) and (f)(4) failed to acknowledge the subtle differences between these

two subparagraphs. Recall that (f)(1) defines the term "emission standard or limitation under this chapter" as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," and (f)(4) is a catchall that sweeps in "any other standard, limitation, or schedule established [1] under any permit issued pursuant to [the Act] or [2] under any applicable State implementation plan . . . ." There would have been no reason to include subpart (f)(4) if Congress wanted enforcement only of permit terms; that is the specific topic of § 7604(f)(3), and may also overlap with (f)(1). We will not assume that Congress had no purpose in mind for (f)(4). The fact that the different subparagraphs of § 7604(f) may overlap to a degree is no reason to reject the natural reading of a statute. Congress may choose a belt-and-suspenders approach to promote its policy objectives, and it appears that this is what it was doing when it added the broader provision to the statute through a later amendment. See Clean Air Act Amendments, Pub. L. No. 101-549, § 707 (adding subparagraph (f)(4) to the existing § 7604(f) in 1990).

The district court found it significant that § 7604(f)(4) was adopted as part of the 1990 amendments to the Act, but not for the sequencing reason we just mentioned. Instead, the district court saw the 1990 amendments as focused on permits and concluded that any ambiguity in § 7604(f)(4) should be resolved in favor of an interpretation that restricts citizen suits to the enforcement of standards and limitations under permits. But, as the plaintiffs rightly note, the 1990 amendments ex-

panded the scope of the Act in a number of areas, only some of which related to permits. For example, the 1990 amendments expanded the EPA's civil enforcement authority for SIPs without reference to permits. See Pub. L. No. 101-549, § 701 (amending 42 U.S.C. § 7413).

Finally, the district court relied on a number of cases to support its view. In our opinion, however, some of those decisions are not on point, and others actually support the plaintiffs. The district court cited five cases in the main text of its memorandum to support its reading of § 7604(f)(4), but four of those are not helpful, as they address only the applicability of (f)(4) to permit terms. See *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738 (9th Cir. 2008); *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346 (11th Cir. 2006); *United States v. Northshore Mining Co.*, 2007 WL 4563418 (D. Minn. 2007); *New York v. American Elec. Power Serv. Corp.*, 2006 WL 840390 (S.D. Ohio 2006). The fifth case, *National Parks Conservation Association v. Tennessee Valley Authority*, 480 F.3d 410, 418 (6th Cir. 2007), quotes the relevant statutory provision and inserts ellipses in the same places as the district court did, but the question before that court was whether the plaintiffs' suit was timely, not the substantive breadth of the citizen-suit provision. The Sixth Circuit thus had no need to explore the issue that is before us.

The district court acknowledged in an endnote that the Fifth Circuit has adopted what it called a "broader reading of the statute," in *CleanCOALition*, *supra.* That is true; moreover, that court addressed our question head on and resolved it in the plaintiffs' favor:

> It is true that § 7604(f)(4) was added as part of Title V of [the Act's] operating permit program . . . and that certain clauses of that section are expressly limited to operating permits. However, the first clause is not so limited and broadly defines "emission standard and limitation" to include "any other standard, limitation, or schedule established . . . under any applicable State implementation plan." . . . Thus, the district court erred in concluding that § 7604(f)(4), in its entirety, is limited to operating permits.

536 F.3d at 476-77 (quoting 42 U.S.C. § 7604(f), and citing *Conservation Law Foundation, Inc. v. Romney*, 421 F. Supp. 2d 344, 350 n.6 (D. Mass. 2006), and *Communities for a Better Environment v. Cenco Refining Co.*, 180 F. Supp. 2d 1062, 1082 (C.D. Cal. 2001), which reach the same conclusion) (internal citations and footnote omitted). On appeal, the plaintiffs have identified two other decisions adopting their approach in *dicta*. See *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004); *Save Our Health Org. v. Recomp of Minnesota*, 37 F.3d 1334, 1336 (8th Cir. 1994). The weight of authority thus favors the approach plaintiffs have advocated.

We conclude that the natural reading of § 7604(f)(4) is the best interpretation of that provision. Congress added this paragraph to expand the scope of citizen suits to include those based on standards, limitations, and schedules under an SIP. This reading does not interfere with citizen suits based on permit terms; so long as a plaintiff has identified a standard, limitation, or schedule

under any permit issued pursuant to 42 U.S.C. §§ 7661-
7661f, then that route is also available.

**III**

All of this may be enough to put the plaintiffs on the
path they desire, but it is not enough by itself. The final
and critical step is to decide whether the particular reg-
ulations that plaintiffs accuse IEI of violating set forth
judicially enforceable standards or limitations.

The first of the two provisions invoked by the plain-
tiffs illustrates well why one cannot take for granted
the suitability of judicial enforcement. Section 201.141 of
Illinois's environmental regulations, entitled "Prohibition
of Air Pollution," is little more than the commandment
"thou shall not pollute." It states in relevant part that
"No person shall cause . . . or allow the discharge or
emission of any contaminant into the environment in
any State so as . . . to cause or tend to cause air pollution
in Illinois . . . ." ILL. ADMIN. CODE, tit. 35, § 201.141. This
is not an "emission limitation" or "emission stan-
dard,"which § 7602(k) tells us must limit "the quantity,
rate, or concentration of emissions"—and so § 7604(f)(1)
does not apply. Indeed, we cannot see how this broad,
hortatory statement could be viewed as a "standard" or
"limitation" at all, and since it is not, then § 7604(f)(4) is
also unavailable. The Illinois environmental regulations
are chock full of specific rules; we do not think that this
statement of principle is the type of "standard" or "limita-
tion" for which Congress provided a cause of action in
§ 7604(a)(1)(A). (Plaintiffs proceed as if all "emissions"

were also "pollution." Perhaps that would make the rule concrete, but it would also make it absurd. Pollution is almost certainly a subset of emissions; otherwise, every time a person exhales carbon dioxide or sneezes she would be "polluting" the air. No one thinks that Illinois has prohibited breathing. The emissions covered by the Act must therefore be defined with some greater specificity, so that people will know what is forbidden.)

The "Fugitive Particular Matter" regulation, ILL. ADMIN. CODE, tit. 35, § 212.301, is a closer call. IEI argues that the Fugitive Particular Matter regulation cannot qualify through § 7604(f)(1) because it does not regulate "emissions of air pollutants *on a continuous basis*" (emphasis added), as the definition in § 7602(k) requires. Whether or not IEI is right on this issue is of no importance, though, if plaintiffs can fall back on the broader language in § 7604(f)(4) and avoid any requirement of continuity.

Once again, the central question is whether the Fugitive Particulate Matter regulation is specific enough for judicial enforcement. The Fugitive Particulate Matter regulation is not like the highly specific limitations and standards found elsewhere in Illinois's environmental regulations, see, *e.g.*, ILL. ADMIN. CODE, tit. 35, §§ 212.123 (limiting certain visible emissions to specified opacity percentages) and 214.121 (limiting certain sulfur-dioxide emissions based on actual heat input), but it is not as grandly general as the Prohibition of Air Pollution, *supra*. We must decide where on the spectrum running from the specific and

enforceable to the hortatory and unenforceable this regulation falls. This is a question of first impression in federal or state court.

The regulation refers to fugitive particulate matter "that is visible by an observer looking generally toward the zenith at a point beyond the property line of the source." ILL. ADMIN. CODE, tit. 35, § 212.301. The questions raised by these mere 19 words are manifold: What are the characteristics of the observer? Where is she standing? Must the matter be visible to the naked eye, and if so, whose naked eye? Is "looking generally toward the zenith" different from looking toward the zenith? Do weather conditions matter? Are there a minimum number of days per year, or hours per day, for assessing visibility? We do not mean that these are metaphysical questions that cannot be answered. Indeed, we have identified some potential answers in Illinois law. See *Cassens Transp. Co. v. The Industrial Comm'n*, 844 N.E.2d 414, 419 (Ill. 2006) (discussing relevant background rules of statutory interpretation); *Paulus v. Smith*, 217 N.E.2d 527, 534 (Ill. App. Ct. 1966) (discussing the meaning of "visible" in a municipal ordinance); see also ILL. ADMIN. CODE, tit. 35, § 201.122 (providing a background rule for evaluating *evidence* of emissions, but not, by its terms, for evaluating standards or limitations placed on emissions). But the regulation does not tell us which of these standards it has incorporated, nor does it suggest that judges have any particular expertise that might be used to craft a parallel system of regulation for this potentially broad area.

We are not the only ones to recognize that this kind of regulation occupies a grey area. The history of this part of Illinois's environmental code reveals that the drafters knew that visual emission standards are inherently problematic, yet they concluded that visual emission standards can play a vital part in Illinois's attempt to protect its air quality:

> Standards based upon the visual appearance of an emission are long-standing, familiar, and relatively unsophisticated. They were much assailed by industry during our hearings, largely because of their subjective nature. . . . On the other hand, pending considerable improvements in scientific monitoring practices, in many cases the appearance of an opaque plume may be the best available evidence of improper operation. With all its drawbacks, therefore, the visual standard is an indispensable enforcement tool.

*In re Emissions Standards*, Illinois Pollution Control Board, Opinion of the Board, R71-23 (Apr. 13, 1972), at 4-310. We do not, however, read this history as a directive that all references to visual emissions necessarily create rules that may be enforced by courts in private suits, rather than standards that the public authorities might wish to use. It is noteworthy that other visual emission limits in the same part of the Code are better candidates for judicial enforcement. See, *e.g.*, ILL. ADMIN. CODE, tit. 35, §§ 212.122 (setting particulate-matter limits based on opacity percentage), 212.123 (same), 212.304 (establishing storage pile operational procedures where uncontrolled

fugitive-particulate-matter emissions exceed a particular mass per year); see also ILL. ADMIN. CODE, tit. 35, § 212.107 (establishing a method for measuring visual emission, and expressly providing that it does not apply to the Fugitive Particulate Matter regulation). These regulations include metrics that are susceptible to objective evaluation in court. The Fugitive Particulate Matter regulation does not.

Recognizing the ambiguity in the text of the regulation, we asked the parties during oral argument if they could identify any specific rules or background principles in Illinois law to guide our interpretation. The parties submitted supplemental briefs on this question, and we thank them for their efforts. In the final analysis, however, we were convinced by these submissions and our own research that it is not our role to flesh out this regulation without better guidance from the competent administrative bodies. In addition, we do not exclude the possibility that an Illinois court might be able to clarify some of the ambiguity. Any statements from the Illinois executive branch—including, but not limited to, formal or informal guidance from the Illinois Environmental Protection Agency—should be given due consideration by any court interpreting this provision and its interaction with the Act. Without any such guidance, however, we conclude that the Fugitive Particulate Matter regulation cannot be used as the basis of a citizen's suit under the Clean Air Act.

With the federal claims out of the case, the district court was well within its rights to dismiss the supplemental

state claims without prejudice. The judgments of the district court are AFFIRMED.