RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SIERRA CLUB; MICHAEL SINCLAIR; THERESA
COLE; JOSEPHINE COLE,
                          *Plaintiffs-Appellees,*

                                                          No. 10-3269

           *v.*

                                              >

CHRISTOPHER KORLESKI, Director, Ohio
Environmental Protection Agency,
                          *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00865—Mark R. Abel, Magistrate Judge.

Argued: July 20, 2011

Decided and Filed: May 25, 2012

Before: SILER, COLE, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Alexandra T. Schimmer, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellant. D. David Altman, D. DAVID ALTMAN
CO., L.P.A., Cincinnati, Ohio, for Appellees. Peter J. McVeigh, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Curiae. **ON BRIEF:**
Alexandra T. Schimmer, David M. Lieberman, Gregg H. Bachmann, Thaddeus H.
Driscoll, Samuel C. Peterson, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellant. D. David Altman, Justin D. Newman, D. DAVID
ALTMAN CO., L.P.A., Cincinnati, Ohio, for Appellees. Peter J. McVeigh, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., David E. Northrop, Robert
L. Brubaker, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for
Amici Curiae.

       KETHLEDGE, J., delivered the opinion of the court, in which SILER, J., joined.
COLE, J. (pp. 19–21), delivered a separate dissenting opinion.

1

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  The State of Ohio, pursuant to legislation passed by its General Assembly and signed by its Governor, has chosen no longer to administer a particular federal regulation promulgated under the Clean Air Act.  The plaintiffs brought this lawsuit to compel the State to administer the federal regulation.  As authority for the suit, the plaintiffs invoke the Clean Air Act's citizen-suit provision. The State contends that the suit is not authorized by that provision.  The district court agreed with the State's contention, but felt bound to rule otherwise in light of a case decided in 1980 by this court. The district court therefore entered an injunction expressly ordering the State to administer the federal rule.  We conclude, based upon intervening Supreme Court precedent and the text and structure of the Clean Air Act itself, that the Act's citizen-suit provision does not authorize this lawsuit.  We therefore reverse the district court's judgment and remand with instructions to dismiss the complaint.

I.

A.

"The federal Clean Air Act is a model of cooperative federalism."  *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004).  The Act requires the EPA to establish National Ambient Air Quality Standards for certain types of air pollutants. 42 U.S.C. § 7409.  Although the Air Quality Standards are set federally, the "primary responsibility for assuring" they are met lies with the States. *Id.* § 7407(a).  To that end, the Act directs each State to propose a state implementation plan ("SIP") that "specif[ies] the manner in which national . . . air quality standards will be achieved and maintained" in that State.  *Id.*  A State has flexibility to tailor its SIP to local circumstances, so long as the SIP includes certain requirements for permits, enforcement, emissions monitoring, and the like.  *Id.* § 7410(a)(2).

If a State fails to propose a SIP, or proposes one that the EPA determines will not meet the Air Quality Standards, then the EPA may impose its own federal implementation plan for the State. *Id.* § 7410(c). In contrast, if the EPA approves a State's proposal, then the SIP is added to the Code of Federal Regulations and becomes federal law. At that point, the State's ability to modify the SIP is limited. For example, if a State wants to amend its SIP, it must submit the proposed amendments to the EPA for approval, *id.* § 7410(k)(3); and the State may not adopt "any emission standard or limitation which is less stringent than" those in the SIP. *Id.* § 7416.

The Act contemplates that each State will take primary responsibility for enforcing its SIP. If a State fails to enforce the SIP's requirements, the statute affords the EPA itself various means of enforcing them. First, the EPA may take action against violators directly: When "any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit," the EPA's Administrator may "issue an order requiring such person to comply," "issue an administrative penalty order," or "bring a civil action" to require compliance. *Id.* § 7413(a)(1). Second, the EPA can take over administration of the State's SIP: When "violations of an applicable implementation plan or an approved permit program . . . are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively," the Administrator may "enforce any requirement or prohibition of such plan or permit program." *Id.* § 7413(a)(2). Third, the EPA can sanction the State: If the EPA's Administrator determines that a State has failed to implement "any requirement of an approved plan" (among other "State failure[s]"), the Administrator "shall" impose sanctions upon the State, which may include withdrawal of the State's federal highway funds. *Id.* § 7509(a)(4), (b)(1)–(2). Significantly for our purposes, however, the Administrator cannot impose any of the available sanctions until the State has been given 18 months to cure the "deficiency[.]" *Id.* § 7509(a).

To a limited extent, the Act also contemplates private enforcement of its provisions. Specifically, the Act includes a citizen-suit provision that allows "any

person" to file suit against "any person . . . who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation under this chapter[.]"  *Id.* § 7604(a)(1).

B.

The EPA first approved Ohio's SIP in 1972.  *See* 40 C.F.R. § 52.1870.  The SIP prohibits "new source" air polluters in Ohio from installing or modifying an emissions source without first obtaining a permit from the Director of the Ohio EPA.  Ohio Admin. Code § 3745-31-02(A); 40 C.F.R. § 52.1870(c)(127)(i).  Before the Director issues the permit, however, the SIP requires the Director to determine that the new or modified source will employ the "best available technology," or "BAT," to limit its emissions. Ohio Admin. Code § 3745-31-05(A)(3); 40 C.F.R. § 52.1870(c)(127)(i).

The Director enforced the BAT requirement for several decades.  Then, in 2006, the Ohio General Assembly passed legislation that allows the Director to issue permits to smaller emission sources—those producing less than 10 tons per year of emissions ("small emitters")—without first determining whether those sources will employ BAT. Ohio's Governor signed this legislation.   The Ohio EPA amended the Ohio Administrative Code to reflect the exemptions.   These amendments took effect on December 1, 2006.  Since then, the Director has issued permits to small emitters without determining whether those sources will use BAT.  The result is that Ohio no longer administers the BAT requirement against small emitters.

In June 2008, Ohio sought approval to amend its SIP to eliminate the BAT requirement with respect to small emitters.  The federal EPA rejected the proposed amendment on procedural grounds, and thus the BAT requirement remains part of the SIP today.  But the federal EPA has chosen not to enforce the requirement itself, even though the Act empowers it to do so.  *See* 42 U.S.C. § 7413(a).  Nor has the EPA chosen to use any of the various means at its disposal under the Act to induce Ohio to enforce the BAT requirement against small emitters.  *See id.* § 7509(a), (b).

C.

In September 2008, the Sierra Club, joined by three Ohio residents, filed a citizen suit against the Director of Ohio's EPA.  The complaint alleged, among other things, that the Director's refusal to make a BAT determination before issuing permits to small emitters constituted a "violation of [] an emission standard or limitation" within the meaning of the Clean Air Act's citizen-suit provision.  42 U.S.C. § 7604(a)(1). Eventually the plaintiffs moved for summary judgment on this claim.  The district court denied the motion, holding that § 7604(a)(1) of the Act authorizes citizen suits against a State only to the extent the State itself emits pollutants in violation of an emissions standard, rather than against the State in its regulatory capacity.

The Sierra Club moved for reconsideration, citing this court's decision in *United States v. Ohio Department of Highway Safety*, 635 F.2d 1195, 1204 (6th Cir. 1980), which involved a different but related provision of the Clean Air Act.  The district court adhered to its view that the most natural reading of § 7604(a)(1) would not authorize the plaintiff's suit, but thought that the reasoning of *Highway Safety*, if not its specific holding, compelled the opposite conclusion.  The district court therefore granted the Sierra Club's motion for partial summary judgment and ordered Ohio's EPA "to implement and enforce" the BAT requirement against all emitters.

This appeal followed.

II.

The issue presented by this appeal is whether the Clean Air Act's citizen-suit provision, 42 U.S.C. § 7604, authorizes the plaintiffs to sue the State of Ohio to compel the State to administer the BAT requirement against small emitters.  The relevant subsection of § 7604 provides:

(a)  Authority to bring a civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such standard or limitation[.]

*Id.* § 7604(a)(1).

It is undisputed that the State of Ohio, like the federal government, is a "person" potentially subject to suit under this provision. What is disputed is whether the State is subject to the particular kind of suit the plaintiffs filed here.

A.

The plaintiffs' theory is that Ohio's failure to administer the BAT requirement with respect to small emitters is itself a "violation of . . . an emission standard or limitation" as those terms are used in § 7604(a)(1). That theory rests upon the interpretation of two terms. The first is "emission standard or limitation." As a matter of spoken English, one might think that an "emission standard or limitation" is something that itself limits emissions—such as, in this case, the SIP's requirement that a small emitter (say, a gas station) utilize the best available technology to minimize its emissions. In statutes like this one, however, terms often have meanings more technical than colloquial.

The plaintiffs and their amicus, the federal EPA, advance a technical meaning here: In their view, § 7604(f)(4) defines "emission standard or limitation," for purposes of § 7604(a), to include *any* "standard" or "limitation" set forth in a SIP; and they say that "[t]he SIP requirement at issue here—under which Ohio EPA must determine that a source of pollution will employ BAT before issuing a permit—establishes a standard and limitation governing the issuance of permits." U.S. EPA Br. at 5. Thus, in their view, the State's obligation to administer the BAT regime is a standard or limitation for whose "violation" a private party can file suit under § 7604(a). The State responds that

the sentence structure of § 7604(f)(4) makes clear that the provision reaches only standards or limitations that are set forth in a *permit*—which would mean the term does not include the State's obligation to enforce the BAT requirement, since that obligation is set forth only in the SIP.

The Seventh Circuit recently read § 7604(f)(4) the same way the plaintiffs do (albeit in a case brought against a polluter rather than against a State).  *See McEvoy v. IEI Barge Servs., Inc.*, 622 F.3d 671, 678 (7th Cir. 2010).  But for now we will only assume, without deciding, that the plaintiffs' reading of § 7604(f)(4) is correct.

For there is a second term whose meaning the plaintiffs must establish in order to bring this lawsuit—namely, "violation" as used in § 7604(a)(1).  Specifically, the plaintiffs must show that the State's failure to administer the BAT requirement is a "*violation* of . . . an emission standard or limitation." 42 U.S.C. § 7604(a)(1) (emphasis added).  As to this term, the parties have switched sides on the field, with the plaintiffs advancing a colloquial meaning this time, and the State a more technical one.  The plaintiffs' meaning is simple enough:  if the SIP requires the State to administer the BAT regime, and the State fails to administer it, then the State has "violated" that requirement.  But the State responds that "violation" as used in §7604(a)(1) is a term of art, which applies only to regulated entities rather than to the actions or omissions of a regulator *qua* regulator.

The State's argument is based in part upon the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997).  There, the Court held that "the term 'violation[,]'" as used in the citizen-suit provision in the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), "does not include the Secretary [of the Interior]'s failure to perform his duties as administrator of the ESA." 520 U.S. at 173.  The State argues that we should likewise construe the term "violation" as used in 42 U.S.C. § 7604(a)(1) not to include the Director's failure to administer the BAT regime.

As an initial matter, we "'must be careful not to apply rules under one statute to a different statute without careful and critical examination.'" *Gross v. FBL Fin. Servs.,*

*Inc.*, 129 S. Ct. 2343, 2349 (2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). Our task "is not to fashion a sort of judicial string theory, under which we develop universal principles that harmonize different statutes with different language." *Hadden v. United States*, 661 F.3d 298, 303 (6th Cir. 2011). But "if two statutes use the same words in related contexts, the caselaw for one statute might be relevant in construing the other." *Id.* So we will give the two statutes a careful and critical examination here.

The text of the ESA's citizen-suit provision is virtually identical to that of § 7604(a). Indeed, even the United States, arguing as an amicus in support of the plaintiffs in this case, admits now (and affirmatively argued in *Bennett*) that the ESA's citizen-suit provision was "patterned after" the citizen-suit provision in the Clean Air Act, *i.e.*, § 7604. Again, § 7604(a)(1) provides in relevant part:

> [A]ny person may commence a civil action . . . against any person . . . who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation under this chapter[.]

Similarly, the ESA's citizen-suit provision provides in relevant part:

> [A]ny person may commence a civil suit . . . to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof.

16 U.S.C. § 1540(g)(1)(A).

The enabling language of the two provisions is the same: each provision authorizes "any person" to sue "any person" who is alleged "to be in violation of" certain provisions of each Act. (The only difference between the two provisions, so far as this language is concerned, is that the ESA's provision is more broadly permissive of citizen suits, since it permits suits based on a "violation" of any provision of that Act, whereas the Clean Air Act provision here permits suits based on a "violation" only of an emission standard or limitation.)

In *Bennett*, the Supreme Court held that this language did not permit a citizen suit against a federal agency for its failure to perform a regulatory duty. *Bennett* concerned a determination by the United States Fish and Wildlife Service that the operation of the Klamath Irrigation Project—"a series of lakes, rivers, dams, and irrigation canals in northern California and southern Oregon," 520 U.S. at 158—"was likely to jeopardize the continued existence of the Lost River and shortnose suckers[,]" both of which are endangered species. *Id.* at 159. The Service also found that the maintenance of certain minimum water levels within the project would "avoid jeopardy" to the suckers. *Id.* Certain private parties affected by those water levels thereafter sued the Service's Director and the Secretary of the Interior Department (of which the Service is a part) under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g). Two of the plaintiffs' claims were based upon § 1536 of the ESA, which required, among other things, that the Service "'use the best scientific and commercial data available'" before reaching a determination that the suckers were endangered. 520 U.S. at 176 (quoting 16 U.S.C. § 1536(a)(2)). The plaintiffs alleged that the Service had made its "jeopardy determination" without using the best available data, in "violation" of § 1536(a)(2). (That claim is remarkably similar to the plaintiffs' claim here that the State has issued permits without first determining that the permitees will use the "best available technology" to reduce emissions.) The United States responded essentially as the State of Ohio does here: "that the Secretary's conduct in implementing or enforcing the ESA is not a 'violation' of the ESA within the meaning" of the Act's citizen-suit provision. 520 U.S. at 173. That provision, the government said, "is a means by which private parties may enforce the substantive provisions of the ESA against *regulated parties* . . . but is not an alternative avenue for judicial review of the Secretary's *implementation* of the statute." *Id.* (emphasis added).

The Supreme Court agreed: "Viewed in the context of the entire statute, § 1540(g)(1)(A)'s reference to any 'violation' of the ESA cannot be interpreted to include the Secretary's maladministration of the ESA." 520 U.S. at 174. The Court cited three principal reasons for its decision. First, the Court said that the plaintiffs'

interpretation of § 1540(g)(1)(A) was "simply incompatible with the existence of § 1540(g)(1)(C)[.]" 520 U.S. at 173.  The latter subsection provides in relevant part:

> (g)  Citizen suits
>
> (1)  . . . any person may commence a civil suit on his own behalf—
>
> . . .
>> (C) against the Secretary where there is an alleged failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

16 U.S.C. § 1540(g)(1)(C).

The Court observed that, by its plain terms, § 1540(g)(1)(C) "authorizes suit against the Secretary, but only to compel him to perform a nondiscretionary duty under § 1533." 520 U.S. at 173.  And the Court reasoned that § 1540(g)(1)(C) "would be superfluous—and worse still, its careful limitation to § 1533 would be nullified—if § 1540(g)(1)(A) permitted suit against the Secretary for *any* 'violation' of the ESA." 520 U.S. at 173 (emphasis in original).  Thus, if the term "violation" as used in § 1540(g)(1)(A) were construed to allow suits against regulators *qua* regulators, the express limitations upon that kind of suit in § 1540(g)(1)(C) would be meaningless.

The parties dispute the extent to which the same or similar reasoning applies here.  A foundational point is undisputed:  The Clean Air Act contains a provision almost identical to 16 U.S.C. § 1540(g)(1)(C).  Specifically, 42 U.S.C. § 7604(a)(2) provides that "any person may commence a civil action on his own behalf . . . against the Administrator [of the federal EPA] where there is an alleged failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator[.]"

The State argues that § 7604(a)(2) of the CAA, like § 1540(g)(1)(C) of the ESA, specifically addresses the extent to which a citizen can sue a regulatory agency for its regulatory failures or omissions.  And the State observes that § 7604(a)(2) does not authorize private suits against state agencies at all—because that subsection only

authorizes suits against the federal EPA Administrator for nonperformance of mandatory duties under the CAA. Thus, in the State's view, if we interpret the term "violation" in § 7604(a)(1) to include a state's nonperformance of regulatory duties, we would in effect authorize lawsuits that Congress chose specifically *not* to authorize in § 7604(a)(2)—namely, those against a state agency. But that argument begs the question whether § 7604(a)(1) *does* authorize suits against a state regulator *qua* regulator—in which case there would have been no need to repeat that authorization in § 7604(a)(2). On this point the State and the United States have battled to a draw: the first of the three reasons cited in *Bennett* does not strongly support either party here.

But the Court's second reason does. In adopting the government's argument that the term "violation," as used in the ESA's citizen-suit provision, reaches only "regulated parties" rather than regulators, the Court reasoned: "Moreover, the ESA uses the term 'violation' elsewhere in contexts in which it is most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the ESA." *Bennett*, 520 U.S. at 173. One of those "contexts" was the ESA's provision for civil penalties: "Section 1540(a), for example, authorizes the Secretary to impose substantial civil penalties on '[a]ny person who knowingly violates . . . any provision of [the ESA],' and entrusts the Secretary with the power to 'remi[t] or mitigat[e]' any such penalty." 520 U.S. at 173. Another context was criminal: "Nor do we think it likely that the statute meant to subject the Secretary and his officers and employees to criminal liability under § 1540(b), which makes it a crime for '[a]ny person [to] knowingly violat[e] any provision of [the ESA.]'" 520 U.S. at 174.

The same uses of "violation," in the same contexts, are present here. Section 7413(d)(1)(A) of the CAA authorizes the federal EPA Administrator to impose substantial civil penalties against "any person" who "has violated or is violating any requirement or prohibition of an applicable implementation plan." We doubt that the CAA should be read to authorize the head of the federal EPA to impose those penalties against the head of the Ohio EPA. Indeed, the inference here is even stronger than in *Bennett*, because under the CAA the Administrator may impose penalties of "$25,000,

*per day* of violation," 42 U.S.C. § 7413(d)(1)(A) (emphasis added), whereas the ESA only authorizes a penalty of up to $25,000 *total* "for each violation." 16 U.S.C. § 1540(a)(1). The same is true on the criminal side: Under § 7413(c)(1), "[a]ny person who knowingly violates any requirement or prohibition of an applicable implementation plan" is subject to "imprisonment not to exceed 5 years," whereas in *Bennett* the maximum sentence for violations was only one year. *See* 16 U.S.C. § 1540(b)(1).

The United States' response, so far as the civil penalties are concerned, is that § 7413(d)(1)(A) merely affords the EPA Administrator "discretion" to impose ruinous fines upon her counterpart in Ohio. U.S. EPA Br. at 15 n.8. That argument is unpersuasive. *Cf. Sackett v. Envtl. Prot. Agency*, 132 S. Ct. 1367, 1375 (2012) (Alito, J., concurring) ("The position taken in this case by the Federal Government—a position that the Court now squarely rejects—would have put the property rights of ordinary Americans entirely at the mercy of Environmental Protection Agency [] employees"). And as for the prospect of subjecting the Ohio Director to up to five years' imprisonment for his failure to administer the BAT requirement—since, after all, the plaintiffs' entire theory of the case is that the Director "knowingly violate[d] a[] requirement" in the SIP, 42 U.S.C. § 7413(c)(1)—the EPA has nothing to say.

The implications of the plaintiffs' interpretation of the term "violation" as used in the CAA render the interpretation implausible. That is all the more true given the calibrated instruments that the CAA gives the federal EPA to coax states into compliance with a SIP, *see supra* at 2–3—instruments compared to which the civil and criminal penalties described above would be a battleaxe. In *Bennett*, speaking of the civil penalties that would flow from the plaintiffs' interpretation of "violation" there, the Supreme Court said: "We know of no precedent for applying such a provision against those who administer (as opposed to those who are regulated by) a substantive law." 520 U.S. at 173–74. We know of no such precedent either; and so far as we are concerned, this case is not going to be the first.

There remains the Supreme Court's third reason for rejecting the plaintiffs' interpretation of "violation" in *Bennett*, which was that it "would effect a wholesale

abrogation of the [Administrative Procedure Act]'s 'final agency action' requirement." *Id*. at 174. Specifically, under the plaintiffs' interpretation there, "[a]ny procedural default, even one that has not yet resulted in a final disposition of the matter at issue, would form the basis of a lawsuit." *Id.* That reason does not itself apply here, since a state agency's actions are not reviewable under the APA. But an analogous and equally important reason does apply.

Namely, the plaintiffs' interpretation of "violation" in this case is inconsistent with the CAA's sanctions regime. That regime affords the State 18 months to cure its failure to implement a requirement in a SIP, after which the Administrator can impose sanctions in order to induce, but not to compel, the State to implement the requirement. *See* 42 U.S.C. § 7509(a). The point of this waiting period obviously seems to be to encourage the state and federal agencies to work out their differences in the meantime. But the plaintiffs' interpretation of the citizen-suit provision would allow them to bring suit *immediately* upon flagging a State's failure to implement. That would effectively "abrogat[e]" the CAA's 18-month cure period the same way that the *Bennett* plaintiffs' interpretation of the same provision in the ESA would have abrogated the "APA's 'final agency action' requirement[.]" 520 U.S. at 174. And here the plaintiffs could sue not merely to induce, but to *compel* the State to implement the SIP—which again is contrary to the sanctions regime. *Cf. New York v. United States*, 505 U.S. 144, 188 (1992) ("The Federal Government may not compel the States to enact or administer a federal regulatory program"). That is indeed the relief the plaintiffs sought in this case—and that is the relief they received. *See* District Court's Order Granting Plaintiffs' Motion for Partial Summary Judgment, at 17 (Feb. 2, 2010) ("The Director is ORDERED to implement and enforce O.A.C. § 3745-31-05 contained in the U.S. EPA approved SIP"). Simply stated, the immediate, compulsory relief that the plaintiffs sought and obtained in this case makes nonsense of the more deliberate and cooperative regime set forth in 42 U.S.C. § 7509.

Section 7509 provides an even more direct indication that "violation" does not mean what the plaintiffs say it means. Subsection 7509(a) is entitled "State failure[,]"

and includes among its enumerated "failure[s]" situations where the Administrator "finds that any requirement of an approved plan [*i.e.*, a SIP] (or approved part of a plan) *is not being implemented*" by a State. *Id.* § 7509(a)(4) (emphasis added). That is indisputably the situation we have here. *See, e.g.*, U.S. EPA Br. at 7 (stating that the Ohio EPA Director has refused to implement "the Ohio SIP's requirement that an air contaminant source will employ BAT before issuing a permit"). And yet § 7509(a) does not call such a State failure to implement a "violation" of the SIP. What § 7509(a) calls a State's failure to regulate, instead, is a "*deficiency*[.]" *Id.* (emphasis added). Specifically, that section empowers the Administrator to impose sanctions if she finds that a SIP requirement "is not being implemented, unless such *deficiency* has been corrected within 18 months after the finding[.]" *Id.* (emphasis added).

In construing a statute, the words matter. The word that Congress chose to describe the precise regulatory failure at issue here is "deficiency," not "violation." All of the problems described above demonstrate that Congress had good reason not to call this sort of regulatory failure a "violation." We could sift through the statutory text still more to show that Congress distinguished between state failures to regulate and "violations" of a SIP, sometimes within the same sentence. *See, e.g.*, *id.* § 7413(a)(2) (empowering the Administrator to enforce a SIP's requirements directly when she finds that violations of a SIP "are so widespread that such violations appear to *result from* the failure of a State . . . to enforce the plan or permit program effectively") (emphasis added). And we could point to other provisions indicating that the Act limits the term "violator" to regulated entities, rather than regulators. *See, e.g.*, *id.* § 7413(e) (including, among the criteria for "determining the amount of any penalty to be assessed under this section or section 7604(a) of this title," the "size of the business" and the "economic impact of the penalty on the business"). But we will not belabor the issue further.

The text and structure of the CAA make plain that § 7604(a)(1) does not permit citizen suits against state regulators *qua* regulators. Instead, like the nearly identical ESA provision that even the United States says was "patterned after" it, § 7604(a)(1) is only a means by which "parties may enforce the substantive provisions of the [CAA]

against regulated parties[.]" *Bennett*, 520 U.S. at 173. We would reach that conclusion even without the benefit of the Supreme Court's analysis of the nearly identical provision in *Bennett*; and we are compelled to reach it here, because we have no lawful basis to distinguish that case from this one.

B.

The plaintiffs argue nonetheless that our decision in *United States v. Ohio Department of Highway Safety*, 635 F.2d 1195 (6th Cir. 1980), requires us to construe § 7604(a)(1) to authorize the citizen-suit here. In *Highway Safety*, we construed the term "violation" as used in § 7413(a)(1) to include the State of Ohio's refusal "to withhold registration from vehicles which have not passed emission inspection." 635 F.2d at 1197. (Under the SIP, vehicles in certain counties needed to pass an emission inspection in order to register.) In response, the federal EPA sued the State as a party "in violation" of the SIP, as that term is used in § 7413(a)(1). The State responded that § 7413(a)(1) authorized the EPA to sue only regulated parties, not the State in its capacity as regulator. Specifically, in reasoning similar to that later adopted by the Supreme Court in *Bennett*, the State argued that § 7413(a)*(2)*—entitled "State failure to enforce SIP or permit program"—was the subsection of § 7413(a) that dealt specifically with such regulatory failures, rather than the more general (a)(1). After briefly reviewing the statutory text, our court acknowledged that "there is no explicit authorization in the Act for EPA to bring a direct action against a state under section [7413](a)(1)." 635 F.2d at 1202. We then turned to the Act's legislative history, which we said was "imprecise." *Id*. at 1203. Over one judge's dissent, we nonetheless concluded that the State could be sued as a "violator" under § 7413(a)(1). 635 F.3d at 1204.

That specific holding is technically not binding on us here, since in this case we construe § 7604(a)(1) rather than § 7413(a)(1). And for several reasons, we choose not to extend that holding to § 7604(a)(1). The first is that the reasoning of *Highway Safety* is dubious at best: the court overlooked all of the textual and structural indications described above, to hold, on the basis of "imprecise" legislative history, that States are subject to suit under § 7413(a)(1). Second, and most important, to the extent that

*Highway Safety* can be read to imply that the term "violation" as used in § 7406(a)(1) includes the actions or omissions of a state regulator *qua* regulator, the case is irreconcilable with the Supreme Court's later construction of a nearly identical provision in *Bennett*. At least to that extent, therefore, *Highway Safety* is no longer good law. And third, the case came during an era whose conception of the state-federal relationship has been superannuated by the Supreme Court's later decisions in *New York* and *Printz v. United States*, 521 U.S. 898 (1997). Courts no longer use balancing tests to hold that the federal government can "require" a State to administer a federal regulatory program, which is what we did in *Highway Safety*. 635 F.2d at 1205. *Compare New York*, 505 U.S. at 188 ("The Federal Government may not compel the States to enact or administer a federal regulatory program"). In summary, *Highway Safety* is a bottle of dubious vintage, whose contents turned to vinegar long ago, and which we need not consume here.

The plaintiffs also refer us to cases from three other circuits, which putatively support the plaintiffs' position here. But in one of those cases, the state (actually, municipal) defendants never argued that they were not subject to suit in their regulatory capacities under § 7604(a)(1); and thus the court never analyzed that issue. *See Coal. Against Columbus Center v. City of New York*, 967 F.2d 764 (2d Cir. 1992). And the Ninth Circuit's decision *McCarthy v. Thomas*, 27 F.3d 1363 (9th Cir. 1994), does not mention § 7604(a)(1) at all. So neither case construes the provision we must construe here. It is true that, as a factual matter, each case involved a state defendant who, for whatever reason, chose not to raise the argument that Ohio raises here. But we will not construe § 7604(a)(1) based upon that fortuity. The case from the remaining circuit, *American Lung Ass'n of New Jersey v. Kean*, 871 F.2d 319 (3d Cir. 1989), did "conclude that we do have jurisdiction under section [7604] to adjudicate citizens' suits against the state in its regulatory capacity." *Id*. at 324–25. But in doing so the court merely assumed, without discussing, that a state failure to regulate is a "violation" rather than a "deficiency" under the Act. Moreover, all of these cases are pre-*Bennett*. Suffice it to say that we follow *Bennett.*

C.

That the plaintiffs cannot sue the State in this case does not mean there are no remedies for the regulatory failure of which they complain.  The Clean Air Act specifically contemplates the very situation we have here:  a "State's failure to enforce [a] SIP or permit program[.]"  42 U.S.C. § 7413(a)(2); *see also id.* § 7509(a).  And the Act affords the federal EPA a wide range of remedies to resolve that situation.  The EPA can order the regulated parties to comply with the BAT requirement, or impose an administrative penalty upon them, or sue them.  *Id*. § 7413(a)(1).  The EPA can administer the BAT requirement itself.  *Id*. § 7413(a)(2).  Or the EPA can engage the State directly, through the process of dialogue and inducement so plainly contemplated by the Act's sanctions provision, § 7509.

That is all to say that this lawsuit is profoundly contrary to the Act's remedial design.  The Act's very nature is, and constitutionally must be, "cooperative." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004).  And thus, in disputes like this one, the Act envisions a cooperative resolution—a resolution, moreover, worked out between branches of the state and federal governments that are in a meaningful sense democratically accountable.  What the Act does not envision is a compulsory resolution imposed by a democratically unaccountable federal judiciary.  And yet that is the path the EPA advocates here.  For whatever reason, the EPA has chosen not to employ any of the means that the Act places at its disposal to resolve its dispute with the State of Ohio.  What the EPA has chosen, instead, is to file an amicus brief in support of this lawsuit.

Which leads to another point.  Section 7509(a) provides that, if the EPA finds that a State has failed to implement a requirement in its SIP, the EPA Administrator "shall[,]" after the 18-month cure period, impose one of the sanctions set forth in § 7509(b).  "Shall," the Supreme Court reminds us in *Bennett*, is an "imperative" term. 520 U.S. at 175.  And § 7604(a)(2) expressly authorizes citizen suits "against the Administrator where there is an alleged failure of the Administrator to perform *any act or duty* under this chapter which is not discretionary with the Administrator[.]"

(Emphasis added.)  So even the plaintiffs themselves have a remedy here.  If they want to sue a regulatory agency, they can do so.  They have simply chosen the wrong one. The agency that the Act authorizes them to sue is the federal EPA.

The judgment of the district court is reversed, and the case remanded with instructions to dismiss the complaint.

———————

**DISSENT**

———————

COLE, Circuit Judge, dissenting.  Adopting the majority's theory yields a particularly peculiar result.  It would permit panels of this Court to reexamine and adopt arguments that previous panels had rejected, solely by questioning the logic of the previous panel's decision.  Because so doing jeopardizes the stability of our jurisprudence, for both future panels and future litigants, I respectfully dissent.

The majority's thoughtful, comprehensive opinion compellingly questions the wisdom of permitting citizen groups to sue state regulators who fail to enforce emissions regulations.  Permitting such private enforcement actions, given the comprehensiveness of the Clean Air Act's regulatory scheme, would, as the majority makes clear, yield uncertainty and confusion.  If the federal administrator deems a state enforcement agency not to be in compliance with its state implementation plan, the state has eighteen months to bring itself into compliance, lest it risk losing federal highway funds.  42 U.S.C. § 7509(a).  Yet, a private group, like the plaintiffs in this case, could demand immediate injunctive relief without giving the state any time to correct its enforcement failings.  The majority opinion, perhaps rightly so, seeks to preclude such enforcement confusion, given that "[t]he federal Clean Air Act is a model of cooperative federalism." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004).

My disagreement stems from the majority's approaches to *Highway Safety* and to the deference that we owe to prior opinions.  "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent.  Consequently, each part or section should be construed *in connection with every other part* or section to produce a harmonious whole." 2A Sutherland Statutory Construction § 46:5 (7th ed.) (emphasis added).  What the majority opinion seeks to do, then, is to have the word "violation" mean one thing under § 7413(a)(3), but something completely different under § 7604(a).  To be sure, although "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning,"

*Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1982), such a presumption can be overcome if it is clear that the legislature intended such divergence, *id.*

The majority argues that because *Highway Safety* discussed a different part of the CAA, that opinion's definition of "violation" is "technically not binding on us here." However, the majority fails to point to any legislative history that rebuts the presumption that words in the same statute have the same meaning. Instead, the majority seeks to distance itself from *Highway Safety*'s holding by substituting its own interpretation of the CAA's legislative intent, and by drawing inferences of such intent from the overall scheme of the CAA. Importantly for our purposes, such arguments were equally applicable, and made and rejected, in *Highway Safety*. The majority opinion in *Highway Safety* examined the enforcement scheme of the CAA to determine if the relevant portion of the statute preferred a unimodal enforcement approach, and concluded that it did not. 635 F.2d 1195, 1201-04 (6th Cir. 1980) ("There is no indication in the legislative history that EPA is limited to proceeding under [only one section] in every situation where a state is an offending party.").

"Sixth Circuit Rule 206(c) is unequivocal: Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court *en banc* consideration [or intervening Supreme Court authority] is required to overrule a published opinion of the court." *United States v. Lucido*, 612 F.3d 871, 878 (6th Cir. 2010) (Batchelder, C.J., dissenting) (internal quotation marks omitted). Which leads us to the real problem: The majority attempts to elude *Highway Safety*'s reach by insisting that developments in federalism theory require abandonment of that case's holding. I am hard-pressed to believe that the penumbrae of cases like *New York* and *Printz* play such an abrogative role. Rule 206(c), a codification of the law-of-the-circuit doctrine, requires more than a belief that the Supreme Court, given current trends in jurisprudence, would overturn *Highway Safety*. There must be some precedential effect of the intervening authority that "requires" us to ignore our prior mandates. *See Caswell v. City of Detroit Housing Com'n*, 418 F.3d 615, 618 n.1 (6th Cir. 2005); *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000)

("[T]he earlier determination is binding authority unless a decision of the United States Supreme Court *mandates modification* . . . .") (emphasis added); *cf. Craft v. United States*, 233 F.3d 358, 378 (6th Cir. 2000) (Gilman, J., concurring) ("The purpose of the intervening-controlling-authority exception is to allow a subsequent panel of this court to respond to a new *precedent*, unavailable to the prior panel, not just a new *decision*.") *rev'd on other grounds*, 535 U.S. 274 (2002). We are not so required here. *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (restricting the overruling of prior precedent to when intervening Supreme Court law is "clearly irreconcilable").

Lastly, after arguing that *Highway Safety* is inapplicable because it analyzes a different provision of the same statute, the majority reverses course and contends that *Bennett*, a case analyzing a wholly different statutory scheme, controls the outcome here. Such a tack is fraught with irony. Why is it that a Supreme Court case about the Endangered Species Act should inform our thinking on the CAA, but a prior binding panel opinion discussing the CAA does not? Mere similarity in language does not create binding precedent; it creates an inference that the interpretation of a word in one statute may apply to the interpretation of that word in another statute. But such inferences alone cannot trump this Court's prior interpretation of *that* word in *that* statute.

The majority opinion is a fine example of nuanced and thoughtful writing, and an opinion which I likely would join, but for *Highway Safety*. Even if all of us doubt that case's enduring vitality, as an individual panel, we are simply without power to abandon its effect. "[T]he law-of-the-circuit doctrine is derived from legislation and from the structure of the federal courts of appeals. Courts of appeals sit in panels, or divisions, of not more than three judges pursuant to the authority granted in 28 U.S.C. § 46(c). The decision of a division is the decision of the court." *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (internal quotation marks omitted). It is, frankly, not up to us to decide if *Highway Safety* is a "bottle of dubious vintage." Regardless of whether its "contents turned to vinegar," we must plug our noses and drink.